No. 24-60558

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JOHN RASH,
*Plaintiff-Appellant/Cross-Appellee,*

*v.*

LAFAYETTE COUNTY, MISSISSIPPI,
*Defendant-Appellee/Cross-Appellant.*

Appeal from the United States District Court
for the Northern District of Mississippi
No. 3:20-cv-224

## PLAINTIFF-APPELLANT/CROSS-APPELLEE'S OPENING BRIEF

JOSHUA TOM
  MS Bar No. 105392
*American Civil Liberties Union of
Mississippi Foundation, Inc.*
P.O. Box 2242
Jackson, MS 39225
(601) 354-3408
jtom@aclu-ms.org

JONATHAN K. YOUNGWOOD
  MS Bar No. 106441
JANET GOCHMAN
ALISON DRAIKIWICZ
*Simpson Thacher & Bartlett LLP*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
alison.draikiwicz@stblaw.com

*Counsel for Plaintiff-Appellant/Cross-Appellee*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Appellant/Cross-Appellee: John Rash

Counsel:

Simpson Thacher & Bartlett LLP
Jonathan K. Youngwood, MS Bar No. 106441
Janet Gochman
Alison Draikiwicz
Pilar Gonzalez Navarrine (*not yet admitted*)
425 Lexington Avenue
New York, NY 10017
Phone: (212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
alison.draikiwicz@stblaw.com
pilar.gonzaleznavarrine@stblaw.com

American Civil Liberties Union of Mississippi Foundation, Inc.
Joshua Tom, MS Bar No. 105392
P.O. Box 2242
Jackson, MS 39225
Phone: (601) 354-3408
jtom@aclu-ms.org

C. Jackson Williams, MS Bar No. 38673
Taylor, MS 38673
Phone: (662) 701-9447
cjxn@mac.com

Appellee/Cross-Appellant: Lafayette County, Mississippi

Counsel:

Clayton O'Donnell, P.L.L.C.
David D. O'Donnell, MS Bar No. 3912
1403 Van Buren Avenue
Suite 103
Oxford, MS 38655-2568
662-234-0900
dodonnell@claytonodonnell.com

McAngus Goudelock & Courie LLC
S. Ray Hill, III, MS Bar No. 100088
119 North 9th Street
Oxford, MS 38655
Phone: (662) 281-7843
ray.hill@mgclaw.com

/s/ *Jonathan K. Youngwood*
Jonathan K. Youngwood
Counsel of Record for
Appellant/Cross-Appellee

## STATEMENT REGARDING ORAL ARGUMENT

This appeal, which follows a three-day bench trial, presents important questions regarding Article III standing in First Amendment speech challenges; time, place, and manner restrictions in public fora; and content-based government restrictions to speech. Pursuant to Fed. R. App. P. 34 and Fifth Circuit Rule 28.2.3, Appellant/Cross-Appellee John Rash respectfully submits that oral argument will assist the Court in resolving the important issues presented by this appeal.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................. 5

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 6

STATEMENT OF THE CASE ................................................... 7

I.     The Parties ..................................................................... 7

II.    The Lafayette County Courthouse Grounds ................... 8

III.   The Facility Use Policy .................................................. 13

IV.   The County's Stated Justification For The Policy ......... 18

V.     Implementation and Enforcement of the Facility Use Policy ....... 20

VI.   Mr. Rash's 2020 Permit Application .............................. 23

VII.  Procedural History ....................................................... 27

SUMMARY OF ARGUMENT .................................................. 32

STANDARD OF APPELLATE REVIEW .................................... 33

ARGUMENT ......................................................................... 34

I.     Mr. Rash Has Standing to Facially Challenge the Facility Use Policy. .................................................................. 34

      A.    Mr. Rash Has Suffered an Injury In Fact. ........... 34

           1.    The District Court Misstated and Misapplied the Governing Legal Standard. ................. 36

           2.    Each Challenged Provision of the Facility Use Policy Has Caused And Continues to Cause Mr. Rash First Amendment Injury. ................. 45

a.     The Curfew Provision is Both Overbroad and Vague.................................................................47

b.     The Other Challenged Provisions Are Overbroad And Vague........................................................50

B.     Mr. Rash's Injuries Would Be Fairly Redressed by a Favorable Decision....................................55

1.     Nominal Damages.........................................................55

2.     Injunctive Relief...........................................................55

II.     The Facility Use Policy Is An Unconstitutional, Content-Based Restriction On Speech In A Traditional Public Forum.......56

A.     The Courthouse Grounds Are A Traditional Public Forum. 57

B.     The Facility Use Policy Is Content-Based.............................60

C.     The Facility Use Policy Does Not Serve A Compelling, Or Even Significant, State Interest Because The County's Stated Interest In Public Safety Is Conjectural...................63

D.     The Facility Use Policy Is Not Narrowly Tailored..............65

1.     The Policy Burdens Substantially More Speech Than Is Necessary........................................................66

2.     The Challenged Provisions' Vagueness Further Prevents Them From Being Narrowly Tailored..........70

E.     The Facility Use Policy Does Not Leave Open Ample Alternative Channels Of Communication............................72

CONCLUSION ...........................................................................73

# TABLE OF AUTHORITIES

## Cases

*Arete Partners LP v. Gunnerman*,
  594 F.3d 390 (5th Cir. 2010) ................................................................. 33

*Blankenship v. Buenger*,
  653 F. App'x 330 (5th Cir. 2016) .................................................. 45, 46

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .................................................................................. 49

*CAMP Legal Def. Fund, Inc., v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006) ...................................................... passim

*Cent. Fla. Nuclear Freeze Campaign v. Walsh*,
  774 F.2d 1515 (11th Cir. 1985) ............................................................. 75

*Chiu v. Plano Indep. School Dist.*,
  260 F.3d 440 (5th Cir. 2001) ............................................. 59, 61, 64, 65

*City of Houston, Tex. v. Hill*,
  482 U.S. 451 (1987) .................................................................................. 77

*Cmty. for Creative Non-violence v. Turner*,
  893 F.2d 1387 (D.C. Cir. 1990) ............................................................. 74

*Collins v. Yellen*,
  594 U.S. 220 (2021) .................................................................................. 34

*Consol. Edison Co. of New York v. Public Service Comm'n of New York*,
  447 U.S. 530 (1980) .................................................................................. 69

*Courtemanche v. Gen. Servs. Admin.*,
  172 F. Supp. 2d 251 (D. Mass. 2001) .................................................. 76

*Ctr. for Individual Freedom v. Carmouche*,
  449 F.3d 655 (5th Cir. 2006) .......................................................... 33, 48

*Douglas v. Brownell,*
   88 F.3d 1511 (8th Cir. 1996) ................................................. 74

*Forbes v. Ark. Educ. Television Commc'n Network Found.,*
   22 F.3d 1423 (8th Cir. 1994) .......................................... 62, 64

*Forsyth Cnty. v. Nationalist Movement,*
   505 U.S. 123 (1992) ................................................. passim

*Frisby v. Schultz,*
   487 U.S. 474 (1988) ......................................................... 71

*Garza v. Starr County,*
   309 F. Supp. 3d 454 (S.D. Tex. 2018) ................................. 79

*Gathright v. City of Portland,*
   439 F.3d 573 (9th Cir. 2006) ............................................ 64

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ................................................... 49, 77

*Grossman v. City of Portland,*
   33 F.3d 1200 (9th Cir. 1994) ........................................ 73, 74

*Hays County Guardian v. Supple,*
   969 F.2d 111 (1992) ................................................... 60, 71

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010). ........................................ 42, 43, 44, 52

*J&B Ent. v. City of Jackson, Miss.,*
   2006 LEXIS 42238 (S.D. Miss. April 7, 2006) ..................... 72

*Justice v. Hosemann,*
   771 F.3d 285 (5th Cir. 2014) ........................................ 35, 49

*Knowles v. City of Waco, Tex.,*
   462 F.3d 430 (5th Cir. 2006) ............................................ 73

*Kovacs v. Cooper,*
    336 U.S. 77 (1949) ............................................................ 80

*Kramer v. Price,*
    712 F.2d 174 (5th Cir. 1983) ......................................... 50

*Laird v. Tatum,*
    408 U.S. 1 (1972) ............................................................ 36

*Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 .............................................. 47, 49, 56

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ....................................................... 34

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ....................................................... 67

*McGlone v. Bell,*
    681 F.3d 718 (6th Cir. 2012) ......................................... 74

*Multimedia Pub. Co. of S. Carolina, Inc. v. Greenville-Spartanburg Airport Dist.,*
    991 F.2d 154 (4th Cir. 1992) ......................................... 69

*N.A.A.C.P. v. Peterman,*
    479 F. Supp. 3d 231 (M.D.N.C. Aug. 18, 2020) ................... 62

*N.A.A.C.P., W. Region v. City of Richmond,*
    743 F.2d 1346 (9th Cir. 1984) .................................. 70, 75

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott,*
    647 F.3d 202 (5th Cir. 2011) ......................................... 48

*Nat'l Federation of the Blind of Texas Inc. v. City of Arlington,*
    2022 U.S. Dist. LEXIS 162768 (N.D. Tex. Sep. 9, 2022). .................... 41

*O'Connell v. Town of Burgaw,*
    262 F. Supp. 3d 316 (E.D.N.C. 2017) ......................... 62, 65

*Occupy Eugene v. U.S. Gen. Servs. Admin.*,
  43 F. Supp. 3d 1143 (D. Or. 2014) ........................................... 63, 65, 73

*Pinette v. Capitol Square Rev. & Advis. Bd.*,
  844 F. Supp. 1182 (S.D. Ohio 1993) .............................................. 63, 65

*Pope v. Illinois*,
  481 U.S. 497 (1987) ................................................................ 50

*Red Lion Broadcasting Co. v. FCC*,
  395 U.S. 367 (1969) ................................................................. 1

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) .............................................................. 66, 68

*Reeves v. McConn*,
  631 F.2d 377 (5th Cir. 1980) ................................................... 49, 51

*Reno v. ACLU*,
  521 U.S. 844 (1997) ................................................................ 77

*Satawa v. Macomb Cnty. Road Comm'n*,
  689 F.3d 506 (6th Cir. 2012) ................................................... 63, 65

*SEIU, Local 5 v. City of Houston*,
  595 F.3d 588, (5th Cir. 2010) ............................................... passim

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ................................................................ 43

*Smith v. Cnty. Of Albemarle, Va.*,
  895 F.2d 953 (4th Cir. 1990) ................................................... 63, 65

*Speaks v. Kruse*,
  445 F.3d 396 (5th Cir. 2006) ..................................................... 77

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ................................................... 36, 38

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ..................... 59

ix

*Stokes v. Cty. of Madison,*
930 F.2d 1163 (7th Cir. 1991)......................................36

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014).............................................35, 39

*Thornhill v. Alabama,*
310 U.S. 88 (1940) .................................................44

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994)...............................................60

*U.S. v. Playboy Entm't Group,*
529 U.S. 803 (2000)...............................................69

*United States v. Nat'l Treasury Emps.' Union,*
513 U.S. 454 (1995)...................................68, 70, 71

*United States v. National Dairy Corp.,*
372 U.S. 29 (1963) .................................................43

*Uzuegbunam v. Preczewski,*
592 U.S 279 (2021) ................................................58

*Virginia v. Am. Booksellers Ass'n,*
484 U.S. 383 (1988)...............................................36

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989).............................................60, 71

**Statutes**

28 U.S.C. § 1291 ..........................................................6

28 U.S.C. § 1331 ..........................................................5

28 U.S.C. § 1343 ..........................................................5

28 U.S.C. § 1983 ........................................................29

42 U.S.C. § 1988 ........................................................29

## **<u>INTRODUCTION</u>**

"It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail[.]" *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969). Following George Floyd's murder on May 25, 2020, citizens across the United States exercised this fundamental right by sharing their ideas through speech, assembly, and protest. Such was the case in Oxford, Mississippi. In 2020, residents of the City and surrounding Lafayette County used the historic Lafayette County Courthouse Grounds (the



*Photo 1: Aerial view of the Courthouse Grounds and Town Square.*
*ROA.4508.*

"Courthouse Grounds," see Photo 1, above), home to a Confederate statue, as a frequent forum to express their views and assemble.

The Courthouse Grounds, located in the heart of Oxford's historic town square (the "Town Square") are a natural gathering place. They have long served as an open and accessible site for formal and informal assembly of Oxford residents and other members of the Lafayette County community, for events ranging from art festivals to political protests to vigils. But in summer 2020, in the wake of the increased political speech, Lafayette County implemented increasingly restrictive permitting policies governing the use of the Courthouse Grounds through a Facility Use Policy. This included a curfew provision (the "Curfew") that prohibited for the first-time events slated to begin 30 minutes before dusk or later. Another provision restricted, again for the first time, the size of gatherings allowed on the Courthouse Grounds, requiring five or more people (later changed to a single person) to get a permit. These restrictions and others imposed significant barriers on residents, including Appellant John Rash, seeking to exercise their First Amendment right on the traditional public fora of the Courthouse Grounds.

Mr. Rash was subject to these restrictions when he applied for a permit in July 2020 to use the Courthouse Grounds for an annual event, "PROJECT(ion)," that was to be part of Oxford's Fringe Festival.  In the free public art event, which Mr. Rash organized and participated in, local artists would project their work on screens and other surfaces on the Courthouse walls for gathering onlookers and passersby.  He had previously held the event on the Courthouse Grounds.  Because the projections occur outdoors, they are, naturally, only visible after dark.  Thus, Mr. Rash's 2020 PROJECT(ion) application was for a nighttime event.

Referencing the recently changed Facility Use Policy, the Lafayette County Administrator denied Mr. Rash's permit application.  Mr. Rash filed this lawsuit to vindicate his rights, alleging that the Curfew and other Policy provisions were unreasonable and content-based time, place, and manner restrictions that unconstitutionally restricted his right to engage in speech in a traditional public forum.

After four years of litigation culminating in a bench trial in February and March 2024, the district court permanently enjoined the County from applying the Facility Use Policy's Curfew provision (but no

other provision) against Mr. Rash, finding that he successfully challenged the Curfew as it had been applied to him with regard to his 2020 permit application. The court concluded that the Curfew was content-neutral (despite its express findings of fact that militated the opposite result) but held that it was not narrowly tailored and was thus an unconstitutional speech restriction as applied to Mr. Rash. The court found, however, that Mr. Rash lacked Article III standing to challenge the Curfew facially and lacked standing to challenge, facially or otherwise, other aspects of the Facility Use Policy. The court dismissed his remaining claims.

The court's legal rulings on standing and the merits to the extent it ruled against Mr. Rash are incorrect. *First,* regarding standing, Mr. Rash was, and continues to be, injured by the Policy, which has chilled his speech and prevented him from hosting and attending future events on the Courthouse Grounds. Mr. Rash can challenge not only the Curfew but other provisions of the Policy: its rule restricting the size of gatherings on the Courthouse Grounds, its advance notice requirement, its sheriff protection fees provision, its insurance and indemnification provision, and its denial of proposed usage provision (the "Other

Challenged Provisions," and collectively with the Curfew, the "Challenged Provisions").

*Second*, as the evidence presented at trial and the court's findings of fact made clear, the Challenged Provisions are unconstitutional. The County arbitrarily enforces the Challenged Provisions, and only against protected First Amendment speech. As administered, the Policy applies only to political expression and speech that conveys a "message" but not to so-called "casual" uses of the Courthouse Grounds. In function and effect, the Challenged Provisions are unreasonable, content-based time, place, and manner restrictions on speech in a traditional public forum. Mr. Rash requests that the Court reverse the district court's judgment dismissing Mr. Rash's First Amendment facial challenges to the Facility Use Policy for lack of standing and permanently enjoin all of the Challenged Provisions.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the underlying lawsuit under 28 U.S.C. § 1331 and § 1343. Following a three-day bench trial, on September 30, 2024, Chief Judge Debra M. Brown of the U.S. District Court for the Northern District of Mississippi issued the

court's Findings of Fact and Conclusions of Law and Final Judgment. ROA.3354-3389.

Appellant timely filed his Notice of Appeal on October 29, 2024. ROA.3563-3564. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision of a United States district court. Appellee filed a Notice of Cross-Appeal on October 31, 2024. ROA.3565-3566.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

This case presents the following issues on appeal:

1. Whether appellant John Rash has standing to assert a facial challenge to the Curfew provision of the Lafayette County Facility Use Policy;

2. Whether John Rash has standing to assert a facial challenge to the Other Challenged Provisions of the Facility Use Policy;

3. Whether the Challenged Provisions are invalid and content-based time, place, and manner restrictions on speech in a traditional public forum.

# STATEMENT OF THE CASE

## I.     The Parties

John Rash is an Oxford, Mississippi, citizen and has lived in Oxford since 2017.  ROA.3356, 3951-3952, 4025.  He is an Assistant Professor of Film Production and Southern Studies at the University of Mississippi. ROA.3356, 3952.  He previously served as a staff producer and director of the University's Southern Documentary Project, producing video, photo, and audio documentaries on the American South.  ROA.3356-3357, 3952.    Starting in 2018, Mr. Rash, partnering with the Yoknapatawpha Arts Council and Visit Oxford, began organizing and participating in an annual event called PROJECT(ion) as part of Oxford's Fringe Festival.  ROA.3367-3368, 3954.  PROJECT(ion) is a free public art event where artists project their work onto screens and other surfaces at night.  ROA.3369, 3954-3955.

Lafayette County, Mississippi is a political subdivision of the State of Mississippi.  ROA.3357.  The County acts through its Board of Supervisors, and the County Administrator exercises authority delegated by the Board.  ROA.3357.

## II.    The Lafayette County Courthouse Grounds

Rebuilt in 1872, the Lafayette County Courthouse sits in the center of the City of Oxford Town Square, which is the center of Oxford's cultural life and "heartbeat" of the community.  ROA.3357, 3819.  The County Courthouse is immediately surrounded by the Courthouse Grounds, consisting of pedestrian pathways, grass, trees, benches, and a Confederate statue erected in 1907 (see Photo 2, below).  ROA.3357, 3878, 4463, 4508-4521, 4530.  Together, the Courthouse and the Courthouse Grounds constitute an enclave of Lafayette County property within the



*Photo 2: Aerial view of Courthouse Grounds and Town Square, with Confederate statue pictured on left.  ROA.4504.*

city of Oxford, which is also home to the University of Mississippi. ROA.3357.

As depicted below, the Courthouse Grounds are octagonal and surrounded by an approximately three-foot tall, intermittent fence with five openings and a perimeter sidewalk (see Photo 3). ROA.3357, 3878, 4506, 4509, 4514-4516. Four crosswalks from the Town Square lead into the Courthouse Grounds' openings. ROA.3357-3358, 4508-4516. The openings are not gated. ROA.3766, 3824, 4111. Many Oxford pedestrians cut across the Town Square through the Courthouse



*Photo 3: Aerial view of the Courthouse Grounds. ROA.4506.*

Grounds. ROA.3358, 3766. Over the decades, groups have frequently used the Courthouse Grounds to sit on the benches (see Photo 4, below), eat frozen yogurt, drink coffee, walk their dogs, take walks, and allow children to play. ROA.3358, 3751-3752, 4011, 4099, 4168, 4336.



*Photo 4: Benches on the Courthouse Grounds. ROA.4515.*

The Courthouse Grounds have been historically—and regularly— used for demonstrations, rallies, and community gatherings. This includes (but is not limited to):

- an annual prayer service;
- an annual law enforcement and veteran appreciation event;

- a major, annual local arts commission event that allows local vendors to sell art in booths and attendees to gather on the Courthouse Grounds;

- Easter celebrations;

- nighttime Halloween events;

- vigils;

- weddings;

- a painting class; and

- a Christmas parade where attendees gather on the Courthouse Grounds.

ROA.3358, 3825, 3834.

The County Administrator, who since 2016 has been Lisa Carwyle, has granted permits for people to use the Courthouse Grounds for political, commercial, religious, social, and memorial services. ROA.3358, 4190-4191, 4233-4239.

A Confederate statue stands just outside the perimeter sidewalk on the southern edge of the Courthouse Grounds and is surrounded by its own slightly larger perimeter sidewalk. ROA.3357, 4504, 4507, 4509, 4519. People have held protests on the Courthouse Grounds, both in favor of and against the statue (see Photo 5, below). ROA.3358, 3835-3836.



*Photo 5: Pro-Confederate demonstration on the Courthouse Grounds on July 4, 2020. ROA.4462.*

From at least 2016 to 2020, ten to twelve events per year took place on the Courthouse Grounds, two to three of them at night. ROA.3358, 4225-4226. In summer 2020, protest activity around the Confederate statue and requests to use the Courthouse Ground increased; County Supervisors received many emails about the statue, and for a few days, the Sherriff temporarily surrounded the statue with barriers. ROA.3362, 4040-4042, 4108-4111, 4177, 4308. The barricades, however, were never reinstalled, nor were any gates or barriers put up to block access to the Courthouse Grounds. ROA.4108-4111.

## III.  The Facility Use Policy

No evidence in the record suggests that Lafayette County's Board of Supervisors actively regulated use of the Courthouse Grounds before 2015.  ROA.3359, 4393-4396.  Before then, no written policy or official permitting policy governed use of Lafayette County property.  ROA.3359, 4190.

On April 20, 2015, the Board adopted the Facility Use Policy, which included limited restrictions on the use of the Courthouse Grounds and required certain users to obtain a Facility Use Permit.  ROA.3359-3360, 4190-4191, 4393-4396.

On March 4, 2019, the Board amended the Policy to increase the requisite advance notice for permit applications and add a provision allowing the County to charge sheriff protection fees under certain circumstances.  ROA.3360-3361, 4397-4401.

Amid the increased protests and media attention following George Floyd's murder, the Board amended the Policy on June 15, 2020, adding significant new restrictions.  ROA.3362, 4113, 4178-4179, 4245, 4278-4279, 4402.  Just a month later, on July 20, 2020, the Board amended the Policy again.  ROA.3363, 4545-4549.  On January 4, 2021, with this

litigation pending, the County adopted the current version of the Policy. ROA.3364-3365, 4288-4291.

This lawsuit challenges the below provisions:

**Curfew**

The 2015 Policy limited use of the Courthouse Grounds after 10:00 pmto events "coordinated and staffed by County employees and/or officials." ROA.3360, 4393-4396. On July 20, 2020, the Board significantly amended the Policy to "require closure of the Courthouse Grounds, including the Confederate statue area, thirty minutes before dusk." ROA.3364, 4545-4549.

The Board did not consider alternatives to this dusk-to-dawn prohibition, like closing the Courthouse Grounds before the bars close at night, closing the Grounds on only certain nights of the week, disallowing certain events after a certain time, or creating exceptions. ROA.3364, 4286-4287, 4318-4319. The Policy also failed to define either dusk or dawn. *See* ROA.4545-4549.[1]

---

[1] County officials and law enforcement follow significantly different understandings of what "dusk" means. *See infra* pp. 70-71.

The County did not post signs on the Courthouse Grounds notifying citizens about the restriction until March 2021, approximately eight months after the Policy changed. ROA.3367, 4269-4283. The signs state, "Attention Visitors: Lafayette County Courthouse Grounds are closed from 30 minutes before dusk until dawn." ROA.3367, 4101. There are still no signs regarding any other policy provisions, nor do any gates or barriers at the openings leading to the Courthouse Grounds physically "close" it. ROA.3766, 3824, 4111.

**1- or 5-Person Rule**

On June 15, 2020, the County amended the Policy to allow "four (4) or less people to use the Historic Courthouse outside [G]rounds, including the area around the Confederate Statue, without a permit," but require "five (5) or more people gathering" to obtain a permit "for use." ROA.3362-3363, 4402. On January 4, 2021 (in the middle of discovery in this case), the County amended the Policy to require permits for all uses and groups of any size (meaning as few as one person), except no permit is required to use the area immediately surrounding the Confederate statue for groups of four or less. ROA.3365, 4544-4549. Under the Policy's strict terms, illogically, not a single person is allowed to be on the

Courthouse Grounds (except for the immediate area surrounding the statue) without a permit at any time. *See* ROA.4545-4549.

### Advance Notice Requirement

The 2015 Policy required a permit application "at least one (1) week in advance of the day needed." ROA.3359-3360, 4393-4396. On March 4, 2019, the County changed this advance notice period to "at least thirty days in advance of the day needed." ROA.3361, 4397-4401. On June 15, 2020, the County amended the Policy to provide an exception to the thirty-day notice requirement where "unusual circumstances make it impossible to make an application prior to the thirty (30) day period," ROA.3362, 4402.

Finally, on July 20, 2020, the County shortened the notice period from thirty days to fourteen days; it also empowered the County Administrator, in her discretion, to shorten or waive the requirement for proposed uses with "urgent need" (the "Urgent Need Exception"). ROA.3363-3364, 4545-4549. The Policy does not define "urgent need" but provides one example: "the desire to demonstrate or engage in speech protected by the First Amendment motivated by events or issues suggesting a need for immediate demonstration or expression, subject to

16

reasonable time, place, and manner restrictions." ROA.3366-3367, 4223-4224, 4545-4549.

### Sheriff Protection Fees Provision

On March 4, 2019, the County amended the Policy to state that the Sheriff "shall determine whether and to what extent additional Sheriff Department deputies are reasonably necessary for the event for traffic control and public safety;" the amendment requires the applicant to pay for the additional security "in full 10 days prior to the event or the event will be cancelled." ROA.3361, 4397-4401. No Policy guidelines define what "reasonably necessary" means or how the costs are assessed. *See* ROA.360, 4397-4401, 4545-4549.

### Insurance and Indemnification Provision

Since April 20, 2015, the Policy has required that the applicant "release the County from any liability" caused to the user or property during time of use, "hold the County harmless from any liability to third parties for injury during the event," and "be liable to the County" for damages to property or County agents during the event. ROA.4393-4396. The provision requires that the permit applicant "provide evidence of a minimum $1,000,000 in liability insurance coverage as part of any

application that may involve 50 or more persons." ROA.4393-4396, 4397-4401, 4545-4549.

### Denial of Proposed Usage Provision

Since April 20, 2015, the County has reserved the right to deny a permit if the use would pose an "unreasonable health or safety risk." ROA.4393-4396, 4397-4401, 4545-4549. In January 2021, this section was amended to allow the County "to deny applications or impose reasonable time, place, and manner restrictions in granting a permit depending on the nature of the proposed use." ROA.3365, 4545-4549. The Policy does not define "unreasonable" risk. *See* ROA.4545-4549. The provision did not provide for any appeals until the County adopted the January 2021 version of the Policy. ROA.4547; *cf.* ROA.49, 4399.

## IV. The County's Stated Justification For The Policy

Before January 2021, the Policy offered no basis for its restrictions. ROA.4549; *cf.* ROA.4397-4401. The January 2021 version, adopted after this lawsuit commenced, states that "[t]he use of the courthouse grounds . . . is limited given that it is primarily a place of court business" but neither gives a reason for its enactment nor explains why a nighttime

ban on Courthouse Grounds usage is needed given that the Courthouse is not used at night. *See* ROA.4545-4549.

Only within this litigation has the County cited pedestrian and traffic safety concerns as justification for the 2020 Policy amendments, including concerns over lack of manpower and alcohol-related incidents in the town square. ROA.3359, 3364, 4139. These are pretextual justifications. The County produced no evidence that activities on the Courthouse Grounds, political or not—including nighttime events— have ever created safety concerns, strained law enforcement, or resulted in violence or physical injuries. And there is no evidence of any arrests on the Courthouse Grounds. ROA.3388, 3817, 3837, 3902-3904, 3908-3914.

In discovery, at the County's request, the Oxford Police Department produced data summarizing safety incidents in the Town Square and the broader downtown area between 2015 and 2020. ROA.4468. Not one incident was identified as having specifically occurred on the Courthouse Grounds or having been associated with activity taking place on the Grounds. ROA.3910-3914. Further, neither of the two alcohol-related fatal car accidents identified at trial as having occurred in Oxford in the last three years happened on the Town Square

or in the area immediately adjacent to the Courthouse, and neither involved activities taking place on the Courthouse Grounds. ROA.3359, 3940-3942.

Police maintain a strong presence in the Town Square, in part because the Square is home to several bars. ROA.3358-3359, 3812, 3837, 4166. Oxford Police, the County Sheriff's Department, and University Police coordinate efforts to patrol the Square and surrounding area. ROA.3882, 3891-92, 3893, 3896. Oxford Police provides a dedicated Town Square detail, including mounted police and cameras with facial recognition capabilities. ROA.3837. Thursday, Friday, and Saturday are the busiest nights on the Square; on these nights, the Oxford police increase police staffing in the area. ROA.3358-3359, 3886-3887. The area also gets busier when the University of Mississippi is in session. ROA.3810-3811.

## V. Implementation and Enforcement of the Facility Use Policy

County Administrator Lisa Carwyle administers and implements the Policy. ROA.3358, 3366, 4190-4191. If a permit application violates the Advance Notice Requirement, Ms. Carwyle exercises discretion in consultation with the Sheriff to determine whether the Urgent Need

Exception applies. ROA.3367, 4153-4154. To enforce the Curfew, Ms. Carwyle googles when dusk is supposed to be on the requested date. ROA.3366, 4191-4200. She then sends the application to the Sheriff (since 2020, Joey East) to determine the extent of security needed. ROA.3366, 4121-4123. Sheriff East considers the type of event and whether there may be counter-protestors. ROA.3366, 4121-4123.

Purpose—i.e., content—determines if someone must apply for a permit. Though the current Policy technically prohibits gatherings of any size, the County considers the nature of use when assessing whether someone must apply for a permit. ROA.3367-3368, 4292-93. These are content-based determinations. County officials and law enforcement do



*Photo 6: Crowds gathered for the 2021 Christmas parade. ROA.4538.*

not require permits for so-called "casual uses" but would require permits from groups engaging in political or expressive speech. *See infra* pp. 61-62. The County has permitted various groups of its liking to violate the Policy without interference. For example, during the December 2021 Christmas parade, law enforcement did not enforce the Policy against several hundred people who stood on Courthouse Grounds to watch the nighttime parade (see Photo 6, above, and Photo 7, below). ROA.3368, 3775-3781, 4533, 4538.



*Photo 7: Crowds gathered for the 2021 Christmas parade despite signage warning of the Curfew.ROA.4533.*

## VI. Mr. Rash's 2020 Permit Application

In 2019, Mr. Rash held PROJECT(ion) on the Courthouse Grounds (see Photo 8). ROA.3369, 3970, 4464. For Mr. Rash, holding an event on the Courthouse Grounds is important; it is a highly visible space for civil and community engagement and accessible to accidental foot traffic, as opposed to, for example, a private, commercial space that carries connotations of consumerism. ROA.3971-3974. Artists could project on all four sides of the Courthouse, as they did during the 2019 event.



*Photo 8: The 2019 PROJECT(ion) event on the Courthouse Grounds. ROA.4464.*

ROA.4029.  PROJECT(ion) cannot be held in daylight since it is impossible to clearly project onto an outdoor surface when the sun is up without expensive, specialized equipment.  ROA.3957-3958.

Mr.  Rash planned to hold the event on the Courthouse Grounds again on August 8, 2020.  ROA.3369, 3964-3967.  He emailed Ms. Carwyle on July 7, 2020, to inquire about the permit process.  ROA.3369, 4387.  Mr. Rash followed up via email on July 14, 2020, submitting a permit application for 8:00 pm to 11:00 pm on August 8, 2020, estimating a turnout of about thirty people.  ROA.3369-3370, 4433.  In his application, Mr. Rash stated under "Explanation of Use" that the event was for "artists installations with light and projectors onto screens and courthouse objects."  ROA.3370, 4433.

After reviewing the application, Ms. Carwyle called Mr. Rash "to get a little more information;" then she sent the application to Sheriff East, telling him the event was a "projection show".  ROA.3370, 4434. Sheriff East replied that he would "check on this to see what exactly they want to do."  ROA.3370, 4434.

On July 16, 2020, a deputy from the Sheriff's Department called Mr. Rash to ask about his permit application, specifically inquiring

whether the projections would include content about the Confederate statue.  ROA.3370, 4020.  Mr. Rash stated he could not guarantee such content would be omitted from the event.  ROA.3370, 4020.

Just four days following this exchange, on July 20, 2020, the Lafayette County Board of Supervisors amended the Policy to restrict any use of the Courthouse Grounds thirty minutes before dusk. ROA.3364, 4545-4549.  Three days after that, on July 23, 2020, Ms. Carwyle denied Mr. Rash's permit application, purportedly because the proposed use violated the Curfew.  ROA.3370, 4388, 4432.  The denial stated that due to a change in the County's permit Policy, "[n]o permits will be issued after dusk, due to security issues."  ROA.3370.  Ms. Carwyle never identified the nature of any "security issues."  *See* ROA.3370, 4388.

Because of the denial, Mr. Rash had to hold the PROJECT(ion) at City Hall (see Photo 9) on August 8, 2020. ROA.3371, 3958, 3971, 3973-3974, 4063. Since this space was smaller, not in the Square's center, and had less surface to project upon, Mr. Rash culled the number of participating artists. ROA.3518, 4063. City Hall's walls are made of red brick rather than the white of the Courthouse and therefore cannot show the images projected onto its walls as clearly. ROA.3518.



*Photo 9: The City Hall. ROA.3518.*

Mr. Rash intends to hold PROJECT(ion) on the Courthouse Grounds in the future but, absent an injunction obtained through this litigation, cannot due to the Facility Use Policy. ROA.3371, 4009-4010. The Yoknapatawpha Arts Council has asked Mr. Rash to hold

PROJECT(ion) every year since 2020; he always expressed interest but declined, as this litigation was pending and PROJECT(ion) would not be viable without a permit.  ROA.3371, 3968.

According to Mr. Rash, it would be "a waste of his time and money [to apply] because there is a fee to file a permit" since the Policy, as amended in January 2021, "stat[es] clearly that [the courthouse] grounds aren't available for permit after dusk." ROA.3371, 3968.  He would hold PROJECT(ion) every year and indefinitely into the future on the Courthouse Grounds if he could.  ROA.3971-3973, 4010.

Though Mr. Rash has not applied for a permit to host PROJECT(ion), or any event, on County property since his unsuccessful 2020 application, he intends to continue attending and documenting political events on the Courthouse Grounds.  ROA.3371, 3993, 4040.  Mr. Rash has attended or documented ten or more protests around the Town Square, about half of those on Courthouse Grounds,.  ROA.4040, 4042.

## VII.  Procedural History

On July 31, 2020, Mr. Rash filed a § 1983 claim against Lafayette County in the district court, alleging First and Fourteenth Amendment violations.  ROA.24-36, 3354.  The Complaint alleged that Lafayette

County's Facility Use Policy imposes an unconstitutional prior restraint and violates the First Amendment's prohibition against unreasonable and content-based time, place, and manner restrictions in a traditional public forum. ROA.206-228. Mr. Rash sought permanent injunctive relief, declaratory judgment, nominal damages in the amount of $100.00 and an award of reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988. ROA.206-228, 3354-3355.

On August 5, 2020, Senior U.S. District Judge Neal Biggers, who was originally assigned to the case, held a preliminary injunction hearing in the federal courthouse in Oxford, which is a few blocks off the Town Square. ROA.3354, 3583-3677. The court held that Mr. Rash had not demonstrated a likelihood of success on the merits, credited the County's stated interest in public safety, held the Curfew content-neutral, and found that City Hall was an ample alternative forum. ROA.194-196. While he denied the injunction, Judge Biggers found that the Courthouse Grounds "function as a public park" because "[i]ts grounds are open to the public, with grass, benches, trees, and pedestrian walkways" and it has "long been a site of protest, rallies, and other community activities."

ROA.189. The County never challenged this holding or description of the Courthouse Grounds and its historic use.

On August 19, 2020, Mr. Rash amended his complaint. ROA.206-228, 3359. On February 2, 2021, he moved for partial summary judgment, and Lafayette County moved for summary judgement on all claims. ROA.344-350, 3355. On September 24, 2021, Judge Biggers denied both parties' summary judgement motions. ROA.2702-2705, 3355. On November 7, 2022, at the court's direction, the parties filed renewed motions for summary judgment. ROA.2870-2872, 2961-2963, 3355.

On August 15, 2023, the case was reassigned to Chief District Court Judge Debra M. Brown. ROA.3044-3048, 3355.[2] Judge Brown denied the renewed motions for summary judgement without prejudice on September 21, 2023, and set the case for non-jury trial in December 2023. ROA.2706, 3051-3052, 3355. Judge Brown's order stated that the court would "independently review" the standing issues raised in the County's motion, ROA.3051. After a further adjournment, the bench trial, which

---

[2] Judge Biggers passed away in October 2023.

included live testimony from nine witnesses, took place in Greenville, Mississippi, on February 29, March 1, and March 5, 2024. ROA.3355, 3714, 3950, 4214.[3] Prior to trial, the court issued a decision via email that denied Mr. Rash standing to challenge various Policy provisions including the Insurance and Indemnification Provision, Denial of Proposed Usage provision, and Sheriff Protection Fees Provision. ROA.3726, 4001-4002, 4066. Mr. Rash and the County each submitted proposed findings of fact and conclusions of law on April 23, 2024, and responded to one another's proposed findings and conclusions on, respectively, May 7, 2024, and May 9, 2024. ROA.3334-3339, 3344-3345.

On September 30, 2024, Judge Brown issued findings of fact and conclusions of law and a final judgement. ROA.3389. The court concluded that to the extent that Mr. Rash presented an as-applied challenge to the Facility Use Policy's Curfew, the County was

---

[3] This case was set for trial six times. The original non-jury trial was scheduled for June 7, 2021. ROA.261. The date was then rescheduled to September 13, 2021, then to February 14, 2022, and then to November 7, 2022. ROA.2632, 2706, 2815. After the case was reassigned to Judge Brown, the non-jury trial was rescheduled to December 11, 2023, and later rescheduled again to February 29, 2024. ROA.3047, 3714.

permanently enjoined from applying such provision to Mr. Rash. ROA.3388.

Notably, the court found that "the County has not established a significant interest in public safety and alternatively, [the Curfew] is not narrowly tailored to serve such interest." ROA.3384-3386. The Court also held that "there was no evidence that the public safety concerns posed by the nighttime activity on the square extended to the courthouse grounds," and the evidence about public safety was focused on conjectural harms that "could" happen instead of any "real harms that the curfew would alleviate." ROA.3384-3385. Moreover, the court held that the Curfew was not narrowly tailored, restricting use of the Courthouse Grounds "seven days a week instead of the days during which the public safety concerns are implicated." ROA.3385-3386.

The court awarded nominal damages on that claim to Mr. Rash. ROA.3387-3388. However, the court dismissed without prejudice his facial challenge to the Curfew and the facial and as-applied challenges to the 1- or 5-person Rule, Advance Notice Requirement, Sheriff Protection Fees Provision, Insurance and Indemnification Provision, or Denial of Proposed Use Provision. ROA.3388. The court stated that the Other

Challenged Provisions had not yet been applied to Mr. Rash and, therefore, he could not challenge the Other Challenged Provisions facially or as-applied. ROA.3377-3379, 3388.

Mr. Rash filed a Notice of Appeal on October 29, 2024, and Lafayette County filed a Notice of Cross-Appeal on October 31, 2024. ROA.3563.

## SUMMARY OF ARGUMENT

*First*, Mr. Rash has standing to facially challenge each Challenged Provision of the Policy. Each of these provisions is overbroad and vague, impermissibly "chilling" protected First Amendment speech. This injury is not ephemeral or conjectural—it is concrete, cognizable, and wholly sufficient to confer standing. The district court erred in holding that Mr. Rash, as a citizen of Oxford and Lafayette County subject to the conscripts of the Policy, lacked standing to facially challenge the Curfew provision and the Other Challenged Provisions.

*Second*, the Challenged Provisions violate the First Amendment. The provisions are content-based because the County applies them to political expression but not "casual uses." As content-based restrictions, the Challenged Provisions are subject to strict scrutiny review; they fail

this test because they are not narrowly tailored to serve a compelling state interest. The County's stated interest in public safety is merely conjectural and thus insufficient to justify a compelling interest, and the provisions burden substantially more speech than necessary. The Challenged Provisions are impermissible time, place, and manner restrictions on speech in a traditional public forum because they are content-based, are not narrowly tailored to serve a significant governmental interest, and fail to leave open ample alternative channels of communication.

## STANDARD OF APPELLATE REVIEW

On appeal from a bench trial, legal determinations are subject to *de novo* review, and factual findings are reviewed for clear error. *Arete Partners LP v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010). Legal questions of standing are, accordingly, subject to *de novo* review. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006) (internal citations omitted). With respect to mixed questions of law and fact, legal conclusions that flow from the underlying facts are also subject to de novo review. *Reich v. Lancaster*, 55 F.3d 1034, 1044-1045 (5th Cir. 1995).

**ARGUMENT**

## I. Mr. Rash Has Standing to Facially Challenge the Facility Use Policy.

"To establish Article III standing, plaintiffs must prove that they have suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins v. Yellen*, 594 U.S. 220, 242 (2021 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The district court incorrectly held that Mr. Rash lacks standing to facially challenge the Challenged Provisions. All three standing requirements have been met as to each provision.

### A. Mr. Rash Has Suffered an Injury In Fact.

Mr. Rash has suffered an injury in fact because (1) he "inten[ds] to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably . . . proscribed by [the policy in question]," and (3) "the threat of future enforcement of the [challenged policies] is substantial." *See Susan B. Anthony List*, 573 U.S. 149, 161-64 (2014).

Notably, "standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can *prospectively seek relief*." *Justice v. Hosemann*, 771 F.3d 285, 294

(5th Cir. 2014) (emphasis added). This approach appreciates that broad laws may "chill the expressive activity of others not before the court." *See Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 129 (1992) (citation omitted). This is particularly true for "pre-enforcement challenge[s] in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020).

Chilled speech and self-censorship establish standing for a First Amendment facial challenge: A plaintiff need not risk punishment under a constitutionally dubious law before challenging its constitutionality. *See, e.g.*, *Laird v. Tatum,* 408 U.S. 1, 11 (1972) (chilling effect suffices if complainant is "presently *or prospectively* subject to" the regulation (emphasis added)), *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (self-censorship is injury, and plaintiffs had "actual and well-founded fear" of prosecution because government provided no assurance it would not enforce the law).

Accordingly, Mr. Rash—a citizen affected by the Policy's implementation—can facially challenge the Policy. *See Stokes v. Cty. of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991) ("all who must apply for a permit" have standing to challenge a permitting policy "since they suffer

the vagaries of discretion"); *see also Forsyth Cty*, 505 U.S. at 129-30 (plaintiff may facially challenge a permitting policy that "creates an impermissible risk of suppression of ideas," including where it "delegates overly broad discretion to the decisionmaker" or "sweeps too broadly").

The Policy has applied and will continue to apply to Mr. Rash. The County denied his 2020 PROJECT(ion) permit based on the Curfew, ROA.3370, 4388, 4432, and Mr. Rash intends to apply for permits and use the Courthouse Grounds for speech and assembly in the future. ROA.3371, 3971-3973, 3993, 4010-4011, 4040. He intends to continue attending and documenting events, like political protests, on the Courthouse Grounds. ROA.3371, 3993, 4040. Mr. Rash has not applied for a permit to use the Courthouse Grounds to host PROJECT(ion) since 2020; although he has been asked to hold PROJECT(ion) each subsequent year, he declined because the Policy chilled his speech and effectively prohibited the event. ROA.3371, 3968.

### 1. The District Court Misstated and Misapplied the Governing Legal Standard.

The district court relied on three distinct legal standards when assessing injury for First Amendment challenges. None comport with the principles outlined above. All are incorrect as a matter of law.

*First*, the district court erroneously held that because the County cited only the Curfew to deny Mr. Rash's permit, he was not injured under, and could not challenge, the Other Challenged Provisions. ROA.3377-3379. The court's ruling is directly contrary to well-established First Amendment standing rules that broadly allow pre-enforcement challenges to regulations that chill speech. *See supra* at 34-35; *Forsyth Cnty.*, 505 U.S. at 129 (citation omitted) ("[I]n the area of freedom of expression[,] an overbroad regulation may be subject to facial review and invalidation, *even though* its application in the case under consideration may be constitutionally unobjectionable."); *Speech First, Inc.*, 979 F.3d at 336 (Plaintiffs who rely on the First Amendment to challenge laws pre-enforcement need not show threats of prosecution; "the threat is latent in the existence of the statute.").

It would be nonsensical that a permit *applicant* be restricted to challenges based on the specifics of their permit denial while non-applicants, unburdened by a past permit rejection, can bring facial challenges against all constitutionally dubious provisions. If this were the law, the County could issue denials one applicable provision at a time—requiring plaintiffs to bring multiple individual challenges and

chilling not only the applicant's free speech rights but others' speech as well.

When a plaintiff is denied a permit under *one* aspect of a permitting policy, standing is not limited to challenging only the provision under which the application was said to have been denied. Plaintiffs have standing when they intend to engage in a future course of conduct proscribed by the law, even when the law has not yet been enforced against them. *See Susan B. Anthony List*, 573 U.S. at 161-64 (2014). Plaintiffs can challenge overbroad, yet-to-be-applied speech restrictions in an overarching regulatory scheme if (1) the provisions would apply to the plaintiff and (2) the plaintiff demonstrated their "intent to hold an [event] that required a permit" under the challenged law. *See CAMP Legal Def. Fund, Inc., v. City of Atlanta*, 451 F.3d 1257, 1276 (11th Cir. 2006).

In *CAMP Legal Def. Fund, Inc.*, a festival organizer had standing to challenge several municipal festival ordinance provisions, given the organizer "has applied for permits in the past . . . and intends to apply for permits in the future." 451 F.3d at 1275-76. The Eleventh Circuit held the organizer could challenge the ordinance's 90-day advance

application provision and liability insurance requirement because it "undoubtedly would be subject to these" requirements. *Id.* at 1274-75. "That city officials ha[d] not yet exercised their discretion to refuse [the plaintiff's] proposed festivals is immaterial because *it is the existence, not the imposition, of standardless requirements*" that cause constitutional injury. *Id.* (emphasis added). "All that constitutional standing requires is that the provision of the ordinance applies to" the plaintiff. *Id.* at 1276.

Likewise, *National Federation of the Blind of Texas, Inc. v. City of Arlington* held that plaintiffs who were subject to a permitting policy could challenge three permitting provisions under the overbreadth doctrine despite the permit being denied under only one policy provision. 2022 U.S. Dist. LEXIS 162768, at *12-14 (N.D. Tex. Sep. 9, 2022). The court relied on the plaintiffs' declarations of intent, conduct prior to the ordinance, and permit denials after enactment of the ordinance to find standing. *See id.* at *12-13. "Though the evidence d[id] not show that [one plaintiff's] application under the [o]rdinance was denied on the basis of [a particular provision]," the plaintiff "was subject to that provision" because they demonstrated future intent to engage in behavior regulated by those provisions. *See id.* at *14. Therefore, the court found it neither

hypothetical nor speculative that the plaintiffs might imminently be harmed by all three provisions. *Id.*

Applying this reasoning to the instant case compels the same conclusion. Like the court stated in *CAMP*, it is the existence, not the imposition, of an ordinance that is applicable to the plaintiffs that causes constitutional injury sufficient for standing. Mr. Rash can challenge each Challenged Provision, not just the Curfew, because "[a]ll that constitutional standing requires is that the provision of the ordinance applies to" him. *CAMP Legal Def. Fund, Inc.*, 451 F.3d at 1276.

*Second*, regarding the Curfew, the district court cites *Holder v. Humanitarian Law Project* for the proposition that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." 561 U.S. 1, 20 (2010). According to the district court, because Mr. Rash has a viable *as-applied* challenge to the Curfew, and because "the curfew . . . was not vague in its application to Rash's 2020 permit," Mr. Rash lacks "standing to assert a *facial* challenge to the curfew." ROA.3374 (emphasis added).

But *Holder* is wholly inapt. In *Holder*, the Supreme Court considered a vagueness challenge under the Fifth Amendment Due

Process Clause, *not* the First Amendment. *Holder,* 561 U.S. at 20. In fact, the *Holder* court explicitly recognized that "a plaintiff [in the same case] may have a valid overbreadth claim *under the First Amendment.*" *Id.* (emphasis added) ; *see also Sessions v. Dimaya*, 584 U.S. 148, 220 (2018) (noting that only "outside the First Amendment context" must "a challenger . . . prove that the statute is vague as applied to him" (citing *Holder*, 561 U.S. at 18-19). The differing standards (i.e., between First Amendment and non-First Amendment challenges) makes sense. In the First Amendment context, courts "are concerned with the vagueness [or overbreadth] of the statute 'on its face' because such vagueness [or overbreadth] *may in itself* deter constitutionally protected and socially desirable conduct." *United States v. National Dairy Corp.*, 372 U.S. 29, 36 (1963) (emphasis added). "Where regulations of the liberty of free discussion are concerned . . . it is the statute, *and not the accusation or the evidence under it*, which prescribes the limits of permissible conduct and warns against transgression." *Thornhill v. Alabama*, 310 U.S. 88, 98 (1940) (emphasis added).

Moreover, Mr. Rash's First Amendment challenge is not solely (or even principally) based on the Curfew's vagueness. Whether his conduct

was "clearly proscribed," *Holder*, 561 U.S. at 20, has no bearing on the efficacy of his facial challenge at all. The district court was therefore wrong to hold that, even if the curfew was "not vague in its application" to Plaintiff, he was somehow precluded from challenging Curfew's facial validity. ROA.3374.

*Third*, the district court's standing analysis regarding the remaining provisions is, too, incorrect. The district court erroneously found that "[b]ecause the other provisions challenged by Rash have not been applied to him and because he has not clearly demonstrated the context in which they would apply to him," Mr. Rash was not injured by the Other Challenged Provisions, and thus "the prudential consideration of third-party standing prevents him from" facially challenging them. ROA.3378. "[B]ecause he has not established an injury in fact for his as applied challenge to the other provisions," the court held, "he lacks standing to challenge them on their face." ROA.3379.

Again, the district court cites inapposite precedent. The court cites *Blankenship v. Buenger*, 653 F. App'x 330, 343-44 (5th Cir. 2016), for the proposition that a party can bring a prospective, as-applied First Amendment challenge only where it can "clearly illustrate the context in

which the [challenged] statute will be applied." *Id.* The Fifth Circuit in *Blankenship* did *not* discuss First Amendment challenges when it used the "clearly demonstrates" language, however; rather, the Fifth Circuit considered an as-applied, procedural due process challenge to a Texas Penal Code provision. *See id.* at 340. In fact, the *Blankenship* court noted that "cases . . . involv[ing] either facial challenges or First Amendment Claims" "are *inapplicable* to this case," as "[s]tanding requirements in the First Amendment context . . . are relaxed because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 343 (emphasis added) (internal quotation marks omitted).

In any event, "prudential considerations of third-party standing," ROA.3378, do not preclude Mr. Rash from challenging the Other Challenged Provisions. As discussed previously, prudential standing considerations in the context of First Amendment challenges are relaxed due to the inherent danger of self-censorship and chilled speech. *See supra* pp. 34-35.

According to the district court, however, a party cannot bring a facial challenge under the First Amendment *without* a corresponding, live, as-applied challenge. ROA.3378-3379. This is not (and cannot be) the law.[4] An inability to bring *prospective*, to-be-applied challenges to speech-proscribing (or, speech-chilling) regulations would sound the death knell for facial challenges under the First Amendment. It is "well established" that speech restrictions "may be subject to facial review and invalidation." *See Forsyth Cnty.,* 505 U.S. at 129; *see also Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 757 (statute vesting unbridled

---

[4] *SEIU, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010), does not counsel otherwise. The district court quotes language from *SEIU*, which itself cites *CAMP Legal Def. Fund* for the proposition that a plaintiff must establish injury under a particular provision of a regulation applied to the plaintiff to assert a facial challenge to that provision. ROA.3378-3379. As discussed previously, *see supra* pp. 38-39, this position misstates the Eleventh Circuit's position in *CAMP*, which held that the plaintiffs had standing to challenge ordinance provisions *applicable* to them, even if those provisions did not form the basis for the permit denial, because it is the "existence, not the imposition" of the scheme that can create constitutional injury. *CAMP Legal Def. Fund, Inc.*, 451 F.3d at 1275-1276. Moreover, in *SEIU*, the court found that the plaintiff did not have standing to challenge a sound ordinance because the plaintiff only challenged the exceptions to the sound ordinance, and the plaintiffs did not demonstrate such exceptions interfered with their activity. 595 F.3d at 597-98. The court noted "a lawsuit is not a general license" to "examine all provisions" of a municipal ordinance. *Id.*

discretion in the hands of a government official is prior restraint that "can be effectively alleviated *only* through a facial challenge" (emphasis added)).  A facial challenge is warranted where every application of a statutory provision impermissibly risks suppression of ideas, including where the ordinance "delegates overly broad discretion to the decisionmaker" or "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected."  *Forsyth Cty., Ga.*, 505 at 129-30 (internal citations omitted).  Such is the case here—as-applied challenges notwithstanding.

2. **Each Challenged Provision of the Facility Use Policy Has Caused And Continues to Cause Mr. Rash First Amendment Injury.**

"[A] chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury" to support standing, *Ctr. For Individual Freedom*, 499 F.3d at 660, if a plaintiff demonstrates "'serious interest' in acting contrary to a statute."  *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208-09 (5th Cir. 2011) (citation omitted).

A statute is overbroad if it "reaches more broadly than is reasonably necessary to protect legitimate state interests" "at the expense of

constitutionally protected speech." *Reeves v. McConn*, 631 F.2d 377, 383 (5th Cir. 1980); *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). Citizens may facially challenge laws as overbroad under the First Amendment when they "may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (citing cases). Likewise, an overbroad statute may give rise to First Amendment injury if it vests unbridled discretion in the government officials charged with evaluating permit applications to engage in expressive activity. *See Lakewood*, 486 U.S. at 759-60.

Vague restrictions, too, can cause to First Amendment injury. Citizens can prospectively seek relief when a law chills their speech or creates chilling uncertainty over whether the law applies to them. *See Justice v. Hosemann*, 771 F.3d at 294. "A defendant may challenge the constitutionality of a statute on vagueness grounds, even though the statute may not be vague as applied to his conduct, where the statute at issue purports to regulate or proscribe rights of speech protected by the First Amendment." *Kramer v. Price*, 712 F.2d 174, 176 n.3 (5th Cir.

1983). Indeed, courts are "especially intolerant of vague statutes in the First Amendment area." *Pope v. Illinois*, 481 U.S. 497, 515 n.8 (1987).

Mr. Rash has suffered and will continue to suffer concrete and particularized injury from the Challenged Provisions because they have chilled his speech. They have prevented him from holding PROJECT(ion) on the Courthouse Grounds and, more broadly, continue to impact his ability to attend and document political events at the forum. ROA.3371, 3968, 3993. Moreover, the Other Challenged Provisions and they grant County officials have chilled and continue to chill Mr. Rash's speech. These injuries are sufficient to confer standing for a facial First Amendment challenge. The district court should not have dismissed Plaintiff's facial challenges to the Policy.

### a. The Curfew Provision is Both Overbroad and Vague.

Mr. Rash established that the curfew has chilled his speech rights. He has standing to facially challenge the Curfew because it is overbroad and vague.

The Curfew is overbroad because it "reaches more broadly than is reasonably necessary to protect legitimate state interests" and prohibits constitutionally protected conduct. *Reeves*, 631 F.2d at 383. By

"requir[ing] closure of the Courthouse Grounds, including the Confederate statue area, thirty minutes before dusk," ROA.3364, 4545-4549, the Curfew blanket prohibits all speech and activity on the Courthouse Grounds outside of limited daylight hours. The Curfew is especially restrictive in winter months when the sun sets earlier. This sweeping prohibition is not limited to speech that the County has legitimate interests in prohibiting, such as threats likely to create public safety issues or interfere with court activities. It is not limited to the Town Square's busiest nights, to nearby bars' business hours, or to defined times. ROA.3364, 4286-4287, 4318-4319. Worse still, the Curfew as written includes no exceptions whatsoever. *See* 4545-4549. It cannot be the case that banning any and all uses of the Courthouse Grounds for so many hours of the day, 365 days a year, is necessary for any purpose.

The Curfew is vague and grants impermissible discretion to the County because it prohibits activity on the Courthouse Grounds after thirty minutes before dusk but does not establish clear criteria for when "dusk" falls. *See infra* pp. 70-71. The Curfew's ambiguous language and the broad discretion granted to the County generates "an impermissible risk of suppression of ideas." *Forsyth Cnty., Ga*, 505 U.S. at 129. Indeed,

the this ambiguity combined with the County's arbitrary discretion creates "chilling uncertainty" over the Curfew's application. *See* ROA.3313, stip. 15 (amended pretrial order stipulating that dusk in Oxford ranges from 4:47 p.m. to 8:14 p.m.).

Furthermore, even if the district court was correct that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to conduct of others," *Holder*, 561 U.S. at 20, its ultimate dismissal of Mr. Rash's facial challenge to the Curfew is still inappropriate. The district court's finding that the Curfew "was not vague in its application to Rash's 2020 permit" is undermined by the facts. ROA.3374. The events Mr. Rash intends to plan and attend, including political events, will not necessarily occur in full daylight or at night. An event scheduled for 5:00 p.m. on a day when "dusk" is 5:25 p.m., for example, would breed uncertainty about the Curfew's applicability. The fact that Mr. Rash's August 2020 event would have likely fallen after the Curfew in 2020 does not preclude Mr. Rash from

holding PROJECT(ion), or any other event, after the Curfew in the future.[5]

### b. The Other Challenged Provisions Are Overbroad And Vague.

In the instant case, Mr. Rash has shown he intends to participate in proscribed conduct and has shown that his speech has been chilled because of the Facility Use Policy, including the Other Challenged Provisions. To hold any event on the Courthouse Grounds, Mr. Rash is subject to all the Challenged Provisions. For events for more than one person, like PROJECT(ion), Mr. Rash would need a permit. ROA.3999-4000 (Mr. Rash estimates past PROJECT(ion) turnout of around 100

---

[5] The PROJECT(ion) event in 2020 would likely have taken place close to the Curfew. ROA.4433. While Mr. Rash's 2020 PROJECT(ion) application listed a proposed time of 8:00 p.m. through 11:00 p.m., 8:00 p.m. is close to dusk on a mid-summer day. *Id.* In fact, per the County officials' typical resource for researching dusk's timing—Googling it, *see* ROA.3366, 4124, 4180, 4199, 4283, 4318—dusk occurred around 8:19 p.m. in Oxford on August 8, 2020. *See* "when was dusk in oxford, ms on august 8, 2020," GOOGLE, https://www.google.com/search?q=when+was+dusk+in+oxford%2C+ms+on+august+8%2C+2020&rlz=1C1GCEA_enUS1128US1128&oq=when+was+dusk+in+oxford%2C+ms+on+august+8%2C+2020&gs_lcrp=EgZja HJvbWUyBggAEEUYOTIHCAEQIRigATIHCAIQIRigATIHCAMQIRig ATIHCAQQIRigATIHCAUQIRigATIHCAYQIRirAjIHCAcQIRirAtIBCT EwMzc1ajBqN6gCALACAA&sourceid=chrome&ie=UTF-8 (last accessed Jan. 2, 2025).

people, with 15-20 people at the event at any given time). He would have to adhere to the Advance Notice Requirement, pay any sheriff protection fees the Sheriff deems necessary, agree to indemnify the County for any losses, and obtain liability insurance if more than 50 people attend. *See CAMP Legal Def. Fund, Inc.*, 451 F.3d at 1274-76 (festival organizer can challenge advance notice and insurance requirements it will "undoubtedly be subject to"). Mr. Rash can facially challenge the Other Challenged Provisions because they apply to him and are each vague or overbroad, or grant the County "unbridled discretion" in enforcement.

The 1- or 5-Person Rule is vastly overbroad. As written, the rule requires persons to acquire permits for all uses and for groups of any size—including as few as a single person—except does not require groups of four or fewer to obtain a permit to use the area immediately surrounding the Confederate statute. ROA.3365, 4545-4549. Applying the letter of the Policy, the rule prohibits *anyone* from using the Courthouse Grounds without a permit, with one exception. *Id.* The 1- or 5-Person Rule would undoubtedly sweep in constitutionally protected speech.

The 1- or 5-Person Rule is also vague because the Policy itself does not define "use." *See* ROA.4393-4401, 4545-4549. The County has unbridled discretion to determine when the rule applies. In practice, County officials would not apply the Policy against "casual" uses and religious prayer on the Courthouse Grounds but would apply it to political speech, speech intended to send a message, or organized demonstrations. ROA.3367-3368, 4126-4127, 4169-4171, 4204-4207, 4292-4294, 4309-4311. This gives too much discretion to the County, as "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech." *Lakewood*, 486 U.S. at 757.

The Advance Notice Requirement is overbroad because it is not restricted to activities with pressing security needs or any other purpose necessitating a fourteen-day lead time. Moreover, the requirement is vague and grants the County impermissibly wide discretion to define its terms. It can be waived for "urgent need," but the Policy only provides one example of what urgent need can mean and no additional criteria. *See* ROA.4545-4549. The one waiver criteria in the Policy is the "desire to engage or demonstrate speech motivated by events or issues

suggesting a need for immediate demonstration or expression," and Ms. Carwyle uses her discretion to apply the Urgent Need Exception. ROA.4209, 4223. The lack of clear criteria leaves potential applicants without a means to know whether their speech falls under the exception.

The Sheriff Protection Fees Provision is also vague because it requires that the person applying for a permit pay for extra security if the Sheriff deems it "reasonably necessary" to have additional deputies due to "unusual security and traffic control measures," yet never draws any standards to govern the Sheriff's discretion, nor indicate how costs will be assessed. ROA.3361, 4397-4401, 4545-4549. The provision creates "chilling uncertainty" for applicants because it will be unclear whether they will have to pay potentially significant law enforcement fees for their event—this determination is out of their hands and in the discretion of the government, which may lead to overbroad applications. Because the County is not subject to any guidelines for assessing whether the provision applies, the County may overestimate the need for security and excessively burden permittees.

For similar reasons, Mr. Rash may challenge the Denial of Proposed Usage Provision. The provision permits the County to deny a permit if it

would pose an "unreasonable health or safety risk" and to "deny applications or impose . . . restrictions in granting a permit depending on the nature of the proposed use." ROA.4393-4401, 4545-4549. It is vague because it does not define the circumstances to which it applies, meaning the County must use its discretion to define this provision. The Policy is also an overbroad burden because it reaches to speech that the County deems "unreasonable"—whether it actually imposes any health or safety risk or not.

Finally, Mr. Rash has standing to challenge the Insurance and Indemnification Provision because it is overbroad. Since it requires applicants to provide evidence of insurance coverage for *any* event involving "50 or more persons," ROA.4393-4401, 4545-4549, it may cover events that do not threaten to cause any property damage or injury. This provision is vague as well, since it is unclear how an event planner can know how many people will attend the event in advance, or whether everyone who passes by the event counts toward the 50 number, versus only, for example, members of the group that organized the event.

## B.  Mr. Rash's Injuries Would Be Fairly Redressed by a Favorable Decision.

### 1.  Nominal Damages.

As the district court correctly held, "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." ROA.3374 (citing *Uzuegbunam v. Preczewski*, 592 U.S 279, 292 (2021)). Mr. Rash's 2020 permit denial due to the Facility Use Policy is a past, completed injury, redressable by nominal damages.

### 2.  Injunctive Relief.

A court may grant injunctive relief where there is a substantial risk that a continuing or threatened injury will occur. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998).  Mr. Rash has declined to hold PROJECT(ion) after 2020, and the Challenged Provisions have prevented him from hosting other events on the Courthouse Grounds despite his ongoing intention to do so.  This sort of self-censorship is a continuing injury redressable by injunctive relief.

## II. The Facility Use Policy Is An Unconstitutional, Content-Based Restriction On Speech In A Traditional Public Forum.

The Challenged Provisions violate the First Amendment because they are content-based restrictions on speech in a traditional public forum and unreasonable time, place, and manner restrictions. A time, place, and manner restriction on speech in a traditional public forum[6] must be content-neutral, be "narrowly tailored to serve a significant governmental interest," and leave open "ample alternative channels [of] communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal citations omitted). Content-based restrictions are subject to strict scrutiny review: they must be "narrowly tailored to a compelling state interest." *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 680

---

[6] The same standard would apply even if this Court finds that the space is a designated public forum. *See Chiu v. Plano Indep. School Dist.*, 260 F.3d 330, 347 (5th Cir. 2001) (quoting *Hays County Guardian v. Supple*, 969 F.2d 111, 116 (1992)) ("[S]peech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum"). The parties agree that the Courthouse Grounds are, at minimum, a designated public forum. ROA.3383 (district court stating that "Rash contends that the Courthouse Grounds are a traditional public forum or, alternatively, a designated public forum. The County argues the courthouse grounds are a designated public forum.").

(1994).  The Challenged Provisions fail each of these applicable tests because they (1) are content-based, (2) do not serve a compelling, or even significant, state interest, (3) are not narrowly tailored, and (4) do not leave open ample alternative channels of communication.

Because the Facility Use Policy is a prior restraint, there is a "heavy presumption" against its validity.  *See Forsyth Cnty.*, 505 U.S. at 130.  Prior restraints "are disfavored and must be confined by 'narrow, objective, and definite standards.'" *SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (citation omitted).  An "ordinance requiring a permit and a fee before authorizing public speaking, parades, or assemblies . . . is a prior restraint[.]" *Forsyth Cnty.*, 505 U.S. at 130.

## A.   The Courthouse Grounds Are A Traditional Public Forum.

The Courthouse Grounds are a traditional public forum.  Spaces that have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" are traditional public fora.  *Chiu v. Plano Indep. School Dist.*, 260 F.3d 440, 344 (5th Cir. 2001).  "Parks" are traditional public fora.  *Id.* Additionally, a public space within a town square is a paradigmatic

example of a traditional public forum. *See Forbes v. Ark. Educ. Television Commc'n Network Found.*, 22 F.3d 1423, 1429 (8th Cir. 1994) ("The first is the traditional public forum, such as the town square[.]").

Courts regularly hold that courthouse grounds are traditional public fora. *See, e.g.*, *N.A.A.C.P. v. Peterman*, 479 F. Supp. 3d 231, 236 (M.D.N.C. Aug. 18, 2020) ( "[t]he courthouse steps and grounds and the sidewalks immediately surrounding [a] courthouse are a traditional public forum" when the grounds were a space with grass and trees, and a large Confederate statue that has historically hosted demonstrations and protests); *O'Connell v. Town of Burgaw*, 262 F. Supp. 3d 316, 320 (E.D.N.C. 2017) ("The Pender County Courthouse Square," a historic courthouse in the town square that featured a Confederate statue, "and its surrounding public streets and sidewalks are traditional public fora."). More broadly, grounds "quite close to the seat of government, and . . . covered by sidewalks" are traditional public fora. *See Satawa v. Macomb Cnty. Road Comm'n*, 689 F.3d 506, 519 (6th Cir. 2012); *see also Smith v. Cnty. Of Albemarle, Va.*, 895 F.2d 953, 958-59 (4th Cir. 1990) (holding courthouse lawn was traditional public forum because "the lawn in front of a seat of government" was "similar to other settings found to be a

traditional public forum"); *Pinette v. Capitol Square Rev. & Advis. Bd.*, 844 F. Supp. 1182, 1184-1185 (S.D. Ohio 1993), *aff'd*, 515 U.S. 753 (1995) (holding statehouse grounds that hosted artistic festivals, religious events, and political speeches were a traditional public forum); *Occupy Eugene v. U.S. Gen. Servs. Admin.*, 43 F. Supp. 3d 1143, 1152 (D. Or. 2014) ("Considering the long history of both protests and other gatherings at the federal plaza . . . the Plaza undoubtedly qualifies as [a traditional public] forum.")

The Lafayette County Courthouse Grounds resemble a park. *See Chiu*, 260 F.3d at 344. Like a public park, the Courthouse Grounds contain pedestrian pathways, grass, trees, and benches. ROA.3357, 3878, 4508-4521, 4530. People use the ungated space to gather on benches, walk their dogs, and play. ROA.3558, 3751-3752, 3766, 4011, 4013, 4099, 4111, 4168, 4336. The Grounds host festivals, religious and holiday events, art classes, weddings, vigils, and political protests. ROA.3358, 3834, 3880-3881. Accordingly, Judge Biggers held in his preliminary injunction ruling that the Courthouse Grounds "function as a public park" because the "grounds are open to the public, with grass, benches, trees, and pedestrian walkways" and it has "long been a site of

protest, rallies, and other community activities." ROA.189. Moreover, the Courthouse Grounds are a public space within a town square. *See Forbes*, 22 F.3d at 1429; *Gathright v. City of Portland*, 439 F.3d 573, 757 (9th Cir. 2006). Sidewalks from the Town Square feed directly into the Courthouse Grounds' openings, and people cross the Grounds to cut across the Square. ROA.3357-3358, 3766, 4508-4516.

The space is also analogous to the courthouse grounds in *Peterman* and *O'Connell*, and the spaces close to the seats of government in *Satawa*, *Smith*, *Pinette*, and *Occupy Eugene*. It is a public place, located near a government building, used to hold events and protests and serve as a forum for political and non-political speech. ROA.3314, 3834-3836, 3880-3881, 4040-4042, 4177, 4334-4335, 4344. Because people use the Courthouse Grounds "for purposes of assembly, communicating thoughts between citizens, and discussing public questions," s*ee Chiu*, 260 F.3d at 344.

## B. The Facility Use Policy Is Content-Based.

Based on the district court's own findings of fact, the court's legal conclusion that the Facility Use Policy is content-neutral is erroneous. ROA.3381. Laws are content-based when they may be facially content-

neutral, but "cannot be 'justified without reference to the content of the regulated speech[.]'" *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation omitted). "[T]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of [] entire topics." *Id.* at 169. Even "more subtle" restrictions "defining regulated speech by its function or purpose" are content-based "distinctions drawn based on the message a speaker conveys." *Id.* at 163-64. As the *Reed* court observed, as an example, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* at 169 (citation omitted). A policy cannot distinguish between "favored" and "disfavored" speech. *See SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010).

Here, the district court misapplied the law to the facts when it found the Policy content-neutral. The court's factual findings support the opposite conclusion—that the Policy is content-based. The Facility Use Policy cannot be "justified without reference to the content of regulated speech." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014). As the district

court found, according to multiple County officials, the nature of use determines whether someone must apply for a permit. ROA.3367, 4292-4293. County officials and law enforcement would not require permits for "casual use," "social gathering[s]" or groups gathered in religious prayer but would require permits for organized demonstrations or groups wanting to express political views. *See* ROA.3367-3368, 4126-4127, 4169-4171, 4204-4207, 4292-4293, 4309-4311. Ms. Carwyle and Sheriff East exercise discretion to determine what is a "casual use." ROA.3367, 4131, 4207-4209. Sheriff East would not apply the 1- or 5-Person rule against five people eating lunch and loudly debating politics on the Courthouse but would consider it applicable if those people "start[ed] handing out signs and . . . occupying space." ROA.4127.

This creates an impermissibly content-based scheme where so-called "casual uses" and prayer are favored while any speech conveying a "message" is disfavored. *See SEIU, Local 5*, 595 F.3d at 596. The Policy evaluates speech based on "function or purpose" by assessing whether speech is meant to convey a message or not. *See Reed*, 576 U.S. at 163-64. The distinction between "casual" versus political and expressive uses is core to how the County implements and enforces the Policy. The

County's restriction echoes the unconstitutional example cited in *Reed* of a restriction that applies to "political speech—and only political speech." *Id.* at 169. It is content-based.

## C. The Facility Use Policy Does Not Serve A Compelling, Or Even Significant, State Interest Because The County's Stated Interest In Public Safety Is Conjectural.

The Challenged Provisions are unconstitutional restrictions on speech because they are unreasonable time, place, and manner restrictions. They do not serve a compelling, or even significant, state interest. When a government implements a policy to "redress past harms or prevent anticipated harms," the cited harm must be "real" and "not merely conjectural." *United States v. Nat'l Treasury Emps.' Union*, 513 U.S. 454, 475 (1995). The government must do more than "simply posit the existence of the disease sought to be cured," *id.*, and "bears the burden of proving the constitutionality of" the restriction. *U.S. v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000). While a government is "entitled to advance its interests by arguments based on appeals to common sense and logic . . . the interest's assertion, without more, isn't sufficient to carry the day and permit the restriction of protected expression." *Multimedia Pub. Co. of S. Carolina, Inc. v. Greenville-Spartanburg*

*Airport Dist.*, 991 F.2d 154, 160-61 (4th Cir. 1992). "[M]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York v. Public Service Comm'n of New York*, 447 U.S. 530, 543 (1980). Generic justifications based on police availability are insufficient. *See N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984).

While public safety can be a compelling state interest, the district court found that "there was no evidence that the public safety concerns posed by nighttime activity on the square extended to the courthouse grounds, despite the proximity of the courthouse grounds to the square." ROA.3384. Present and former County officials recalled no violence, arrests, or traffic or pedestrian safety incidents tied to events on the Courthouse Grounds, ROA.3837, 3902-3904, 3908-3914, 4468. As the district court further found, the County's public safety evidence "focused on 'what could happen,' not real harms that the curfew would alleviate." ROA.3384-3385. Such a focus on "what could happen" is the type of "merely conjectural" stated interest that courts routinely reject. *See Nat'l Treasury Emps.' Union*, 513 U.S. at 475. The County's speculative public

safety concerns do not create a compelling state interest sufficient to justify the Policy.

### D. The Facility Use Policy Is Not Narrowly Tailored.

The Faculty Use Policy is not narrowly tailored because it "burdens substantially more speech than is necessary to further the government's legitimate interests." *See Hays County Guardian v. Supple*, 969 F.2d 111, 118 (1992). To be narrowly tailored, a restriction must "alleviate the[] [stated] harms in a direct and material way." *See Nat'l Treasury Emps.' Union*, 513 U.S. at 475. It must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal citation omitted). While a government need not adopt the least restrictive means of serving its interests, the restriction's means must not be "substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. at 800. "A scheme establishing a prior restraint . . . on protected speech which places unbridled discretion in the decision maker by failing to impose either objective standards for a decision or adequate procedural safeguards, creates an impermissible risk of suppression of that

protected right with every application." *J&B Ent. v. City of Jackson, Miss.*, 2006 LEXIS 42238, at *33 (S.D. Miss. April 7, 2006).

### 1. The Policy Burdens Substantially More Speech Than Is Necessary.

As the district found, the Curfew burdens "substantially more speech than is necessary" to serve the County's stated interest. ROA.3386. The Curfew applies every day, even though the Town Square is busiest on Thursdays, Fridays, and Saturdays, and then, largely only when the University is in session. ROA.3810-11, 3943. The County did not consider alternatives like closing the Courthouse Grounds before the Town Square's bars close for the night, closing the Courthouse Grounds only on certain nights of the week, disallowing certain events after a certain time, or creating an exception to the Curfew. ROA.3364, 4286-4287, 4318-4319.

Courts have struck down provisions like those challenged in this case. The court in *Occupy Eugene*, for example, struck down a similar curfew provision when a government limited use of a public plaza to 8 a.m. to 5 p.m. based on "a need to keep the public safe." 43 F. Supp. 3d at 1150-51. The court found "nothing in th[e] record demonstrate[d] that [the government] had any concerns due to public safety" and held the

restriction "greater than necessary to further the [government's] interest of public safety." *Id.* The Curfew here is similarly restrictive, and the County does establish a sufficient public safety rationale.

Courts have also invalidated permitting policies applicable to smaller gatherings. As a panel in this Circuit observed, "[o]ther circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 436 (5th Cir. 2006). Courts have invalidated laws that regulate gatherings of sizes like those regulated by the 1- or 5-Person Rule. *See Grossman v. City of Portland* 33 F.3d 1200, 1202-08 (9th Cir. 1994) (six persons); *Cmty. for Creative Non-violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990) (two persons); *see also Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (stating that the permit requirement for groups of ten or more people would likely not be narrowly tailored, but not reaching the issue as the plaintiff had not raised it in the lawsuit).

The fourteen-day Advance Notice Requirement is unconstitutionally lengthy. Courts have found notice periods of similar, or shorter, length to be unreasonable. *See McGlone v. Bell,* 681 F.3d 718,

734 (6th Cir. 2012) (invalidating "fourteen business day notice period" as "much longer than other notice periods that have been upheld"); *Douglas*, 88 F.3d at 1523-24 (holding that a "five-day notice requirement is not narrowly tailored"); *Grossman,* 33 F.3d at 1204-08 (holding a seven-day notice provision to be neither narrowly tailored nor justified by the government's safety concerns). The County presented no evidence that it needs a fourteen-day lead time to assess security needs. As one court held regarding a parade permit provision, "[t]here is no basis in logic for cities to demand notice far in advance of parades. Policemen . . . are frequently deployed on less than two days notice." *City of Richmond*, 743 F.2d at 1357.

Courts have found sheriff protection fee provisions unconstitutional. *See Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1523-24 (11th Cir. 1985) (striking down ordinance "which requires persons wishing to use city streets and parks to demonstrate[] to prepay an amount of costs for additional police protection determined by the discretion of the chief of police"); *see also Forsyth Cnty.*, 505 U.S. at 133-36 (noting burden of imposing content-based fee for cost of police protection to protect public safety). Lafayette County's Sheriff Protection

Fees Provision improperly burdens potentially controversial speech by imposing a financial cost on permittees' speech.

The Insurance and Indemnification Provision is also not narrowly tailored. When the state holds a speaker using a forum responsible "not only on expenses for which she may be directly responsible, but also for the expenses potentially created by counter-protestors and others over whom he has no control, an unconstitutional 'heckler's veto' can be created." *Courtemanche v. Gen. Servs. Admin.*, 172 F. Supp. 2d 251, 272 (D. Mass. 2001). The Insurance and Indemnification Provision here impermissibly shifts liability to a permit applicant based on acts of counter-protestors and third parties.

The Denial of Proposed Usage Provision fails because it allows County officials to exercise their discretion, based on nonexistent guidelines, to determine whether an event is "unreasonabl[y]" risky, which threatens to burden any speech that may be controversial. *See* ROA.4545-4549.

The County has not established that any of these provisions are necessary based on public safety, or any other rationale. The Challenged

Provisions sweep broader than necessary and excessively burdens speech.

### 2. The Challenged Provisions' Vagueness Further Prevents Them From Being Narrowly Tailored.

Vague speech restrictions are not narrowly tailored. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 481 (1987). Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). Laws are unconstitutionally vague when they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108-09. Uncertainty about how to define a law's terms can create "chilling uncertainty" that violates the First Amendment. *Speaks v. Kruse*, 445 F.3d 396, 401 (5th Cir. 2006).

The Facility Use Policy's language is unclear on how it will apply in practice, creating "chilling uncertainty" about its implementation and enforcement. *See id.* The Curfew prohibits use from "30 minutes before dusk thru and until dawn" but does not define "dusk" nor state what method the County uses to define "dusk." ROA.4545-4540. Ms. Carwyle ordinarily Googles what time dusk is when implementing the Policy, but this is not written into the Policy itself, ROA.4199, and County officials

adhere to conflicting definitions of "dusk." *See* ROA.3915 (Oxford Chief of Police Jeff McCutchen: dusk is "30 minutes before sunset"), ROA.4124 (Joey East: dusk is "the moment before dark, while there's still light," and would "use common sense" to gauge its timing), ROA.4180 (Supervisor David Rikard: dusk's timing depends on weather), ROA.4199 (Lisa Carwyle: sunset occurs "before dusk" and dusk occurs at "the end of civil twilight when the sun sets completely), ROA.4317 (Supervisor Brent Larson: dusk occurs when there is "no glow left in the sun"), ROA.4283 (Supervisor Larry Gillespie: dusk is "when the sun starts going below the horizon"). These definitions do not all match Mr. Rash's understanding that dusk is when "the sun is going down until it's completely black in the sky." ROA.3996.

The Policy also does not define what "uses" it applies to, nor does the County adopt a consistent definition of "use" in practice. *See Garza v. Starr County*, 309 F. Supp. 3d 454, 459 (S.D. Tex. 2018) (enjoining policy failing to define "use," raising concern that any "use," "even passive political speech," was "prohibited absent application for a permit."). Yet the Policy permits the County to deny or restrict a permit "depending on the nature of the proposed use," ROA.3367, and to County officials, the

nature of the proposed use can determine whether someone needs a permit. ROA.3367-3368. Ms. Carwyle and Sheriff East use their unbridled discretion to determine whether a requested use is a "casual use" when they implement and enforce the Policy. ROA.4207-4209.

The Challenged Provisions are not narrowly tailored because they employ vague language, leading to uncertain application.

### E. The Facility Use Policy Does Not Leave Open Ample Alternative Channels Of Communication.

The Facility Use Policy leaves Mr. Rash without an ample alternative forum. City Hall and private venues do not offer the Courthouse's community significance, visibility, accessibility, and central location. ROA.3974. Artists could project their art on all four sides of the Courthouse, making the event visible across the Square. ROA.4029.

While Mr. Rash held the 2020 PROJECT(ion) event at City Hall after the County denied his permit to use the Courthouse Grounds, ROA.4021, City Hall does not lie at the center of the Oxford Town Square like the Courthouse Grounds do and is not visible from all sides of the Square. *See* ROA.3357 (district court finding that "the County courthouse stands in the center of the Oxford town square"). Moreover, City Hall's walls are dark brick, not white like the Courthouse.

ROA.4517-4518.  Private spaces and sites of commerce do not carry the same connotations of public engagement.  ROA.3972-2973, 4465.

Citizens have a right to "reach the minds of willing listeners," which requires the "opportunity to win their attention." *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949).  The Curfew deprives Mr. Rash of this opportunity because the PROJECT(ion) and requires darkness, ROA.4387, and is impossible to hold in daylight without specialized equipment.  ROA.3958.

## CONCLUSION

For the foregoing reasons, John Rash respectfully requests that the Court reverse the district court's judgment that dismissed Mr. Rash's First Amendment facial challenges to the Facility Use Policy for lack of standing and extend the court's permanent injunction to cover facially all of the Challenged Provisions.

Respectfully submitted,

Dated: January 6, 2025

/s/ Jonathan K. Youngwood

| AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI FOUNDATION, INC. Joshua Tom, MS Bar No. 105392 P.O. Box 2242 Jackson, MS 39225 Phone: (601) 354-3408 jtom@aclu-ms.org | SIMPSON THACHER & BARTLETT LLP Jonathan K. Youngwood, MS Bar No. 106441 425 Lexington Avenue New York, NY 10017 (212) 455-2000 jyoungwood@stblaw.com |
|---|---|

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Fed. R. App. 25(d), on January 6, 2025, I filed this Brief via the Court's electronic case filing ("ECF") system, which will give notice of the filing to counsel for Appellees:

By:    */s/ Jonathan K. Youngwood*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits of Fed. R. App. 28.1(e)(2)(A)(i) and 32(a)(7)(b) because it contains 12,976 words, excluding parts exempted by Fed. R. App. P. 32(f). This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

By: */s/ Jonathan K. Youngwood*